PEOPLE EX REL. BOARDMAN, appellants, *v.* CITY OF BUTTE, respondents.

CONSTITUTIONAL LAW — *Effect of submission of city charter to vote of the people.* — All the legislative powers of the territory are by the organic act vested in the territorial legislature. They cannot be delegated away or lawfully exercised by anybody else. Among these powers is that of creating municipal governments by charter, as auxiliaries in matter of local government. Such charters derive all their powers from legislative enactment, and none from the consent of those who are to live under them; but the legislature may make the consent of one, a few or many of those on whom the charter is to operate, the contingency upon which the charter shall take effect.

A submission to the resident tax-paying householders is competent, legal and proper — no one's constitutional rights are abridged thereby, and none have right to complain. Such limitation of the right to vote does not render void the act of incorporation.

*Appeal from Second District, Silver Bow County.*

S. DE WOLFE, for appellants.

The legislature of Montana territory, at its eleventh regular session in 1879, passed an act "Incorporating the town of Butte." Laws 1879, pp. 77, 88.

Section 2 of article 4 of said act provides as follows:

" All citizens of the United States, and those who have declared their intention to become such, of twenty-one years of age, who shall be tax-paying householders, and who shall have been actual residents of said city three months preceding said election, shall be entitled to vote for city officers, and the adoption of this charter; provided, that said voters shall give their votes in the wards in which they shall respectively reside."

Section 23 of article 7 provides for the submission of the charter to a vote of such qualified voters as are mentioned in section 2, article 4, for their acceptance or rejection, on the first Monday in April, 1879. And further provides that if a majority of the votes cast shall be in favor of the charter, " then this act to be in full force and effect; but if a majority of the votes cast shall be

against the charter, then this act shall remain suspended unless thereafter enforced as hereinafter set forth." Section 23, article 7.

Section 1, article 4, provides for an election to be held on the first Monday in May, 1879, for one mayor in said city, and two aldermen for each ward.

To the complaint or information, the defendants file a demurrer containing nine separate counts.

The first is a general demurrer on the ground that the complaint does not state facts sufficient to constitute a cause of action.

This ground of demurrer will be considered later in connection with the complaint itself.

The second and third causes of demurrer are the same, the difference being in statement only, and the cause being that the action is wrongly brought in the name of the people, and not in the name of the district attorney.

The answer to this is the complaint itself. Code of Civil Procedure, ch. 5, sec. 398.

The fourth, fifth and sixth causes of demurrer are also substantially the same, and demur because Charles S. Warren is improperly made a party defendant. The complaint alleges that the defendant Warren was acting and assuming to act as a police magistrate in said town of Butte, under and by virtue of an election to that office by the persons claiming to be the city council of said town. That, as such police magistrate, he assumed and exercised the general powers and duties pertaining to an office of that kind in said town.

The general object of the action is to have the charter passed by the legislature incorporating the town of Butte declared invalid, because unauthorized, or in conflict with other and paramount law. But as the charter only assumed to create a corporation, and to confer upon it the usual powers of a municipal government, and left to the local government thus established the right of defining the jurisdiction and power of the different officers created

under it, and as Warren claimed to be an officer under said city government, and assumed and exercised judicial power thereunder, he was properly made a party defendant in an action to determine the validity of the city charter.

A corporation can only act through agents. And if there never was an incorporation of the town of Butte, as is contended in the present case, the persons who assumed the exercise of a franchise in the name of the corporation were rightly made defendants. Code, sec. 398; *State* v. *Taylor*, 25 Ohio St. 280; *State* v. *Coffee*, 59 Mo. 59; *State* v. *Cincinnati Gas Light Company*, 18 Ohio St. 262; *People* v. *Carpenter*, 24 N. Y. 86; *People* v. *Draper*, 15 N. Y. 532; *State* v. *Weatherby*, 45 Mo. 17; Dillon on Mun. Corp. sec. 719, note; Angell & Ames on Corporations, sec. 756.

In *The State* v. *Gas Light Co.*, *supra*, the court say: "In an action brought to determine whether a municipal corporation has been in fact created, it may be brought directly against the corporation, or against those who assume to exercise the franchises of a corporation. And the court assigns as a reason for the rule that it might be very inconvenient to make the entire body of corporators parties."

The same doctrine is virtually held in the case cited in 24 N. Y. 86, and by Angell & Ames in sec. 756.

This action is brought to test the validity or legality of the charter; and it is nowhere maintained that, if the charter is a law, but what the individual defendants named in the complaint rightfully hold and exercise the functions of the offices which they respectively fill. On the other hand, if the charter is not a law, the several individual defendants are guilty of usurpation of franchise, notwithstanding they may have acted in entire good faith. The judgment being, in the latter case, under sec. 404 of the code, that the several individual defendants be ousted from the office franchise or privilege so exer-

cised by them; that they pay the costs of the action, and be fined; at the discretion of the court, in a sum not exceeding $5,000.

As against the assumed corporation, the only judgment that it would seem in the power of the court to render is the one prayed for in the complaint, that it be "excluded from all corporate rights, privileges and franchises."

There cannot be a question but what the several individual defendants were properly made such in this action, because the code expressly provides for this proceeding against them if they "usurp, intrude into, or unlawfully hold or exercise, any public office or franchise within his district in the territory." The only doubt that can arise is as to the correctness of making the city of Butte a defendant, while denying that it has, or ever had, a corporate existence.

The defendants have not demurred to the complaint because of the joinder of the city of Butte, but because of the joinder of the other defendants named in the complaint. If it was error, therefore, to make the city a party defendant, it has been waived by a failure to demur on its part. A defendant properly joined cannot demur to the complaint for the misjoinder of another defendant. If a complaint state a cause of action against one or some of several defendants, a joint demurrer cannot be sustained. *People* v. *Mayor et al.* 28 Barb. 240; *Woodbury* v. *Sackrider*, 2 Abb. Pr. 402; *Ashby* v. *Winston*, 26 Mo. 210; *Richnuger* v. *Richnuger*, 50 Barb. 55; *R. R. Co.* v. *Schuyler*, 17 N. Y. 592; *Pinckney* v. *Wallace*, 1 Abb. Pr. 82.

In *The Territory* v. *Virginia Road Co.* 2 Mon. 96, it was strenuously insisted on the part of the defendant, that, as the complaint denied the existence of the corporation, the action, instead of being brought against the corporation by name, should have been against the persons who assumed to exercise powers in its name. But

the court, upon a full review of the authorities, which it there refers to, decides that the action was properly instituted against the corporation by name. The only difference between that case and the present is, that in the former it is conceded that the defendant once had a corporate existence, while in this it is denied.

The seventh and eighth causes of demurrer are likewise the same in substance, and allege that the several defendants mentioned in the complaint as composing the city council of Butte are improperly joined as defendants. The reasons and authorities cited in reference to the defendant Warren are likewise applicable to these other defendants.

The ninth ground of demurrer is that the complaint is ambiguous and uncertain. First, because it alleges that the act of the legislature incorporating the city is valid. This is evidently a misapprehension on the part of the pleader, as the entire scope of the complaint is to deny the validity of the legislation. The complaint in words declares that the various acts done by the defendants, and which are recited in the complaint, were done " without right, warrant, charter, or authority in law." This is the allegation of a conclusion of law only, and as such was unnecessary, but it certainly amounts to a denial of the validity of the act incorporating the city.

The second ground of ambiguity and uncertainty alleged is that the complaint does not aver that the act is in violation of the constitution of the United States or the organic act of the territory, or that it is not a rightful subject of legislation. If these were proper grounds of demurrer they would come under the first head, that the complaint does not state facts sufficient to constitute a cause of action. But they are at best only conclusions of law which follow the allegations which the complaint does contain, and whether made expressly or not, the court will determine from the allegations that are made, whether such conclusions result, and will render judgment accordingly.

The tenth and last ground of demurrer is that the court has not jurisdiction to annul the charter or set aside the act of the legislature creating the corporation. If by "annulling the charter," or "setting aside the act of the legislature," is meant that the court had not the jurisdiction to declare the act in question invalid as being in conflict with some higher and paramount law (if such was the judgment of the court), I deny wholly the position assumed as law in this branch of the demurrer.

Beyond this it will not be contended that the court, any more than an individual, can go.

It would seem unnecessary at this day to cite authority to show that a court of general jurisdiction — such as the district courts of a territory possess — have the authority to declare a legislative act unconstitutional, if such is the opinion of the court. It not only has the authority to do so, but it is inseparable from the exercise of judicial power. The oath which every judge takes before he enters upon the duties of his office, compels him to declare a legislative act void if it conflicts with the constitution or any higher and paramount law.

In *Marbury* v. *Madison*, the supreme court of the United States, speaking through Chief Justice Marshall, the greatest of all constitutional expounders, declares that:

"A legislative act repugnant to the constitution cannot become the law of the land, and it is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule. If two laws conflict, the courts must decide on the operation of each. So if a law be in opposition to the constitution. If both the law and constitution apply to a particular case, the court must either decide the case conformably to the law, disregarding the constitution, or conformably with the constitution, disregarding the law. The court must determine which of these conflicting rules governs the case. *This is of the very essence of judicial duty.*"

The rule thus clearly laid down has been many times repeated, and by many courts of the highest authority. And the principle is too firmly established both by reason and authority to be now questioned.

Returning to the first ground of demurrer, does the complaint state facts sufficient to constitute a cause of action?

In deciding this, the entire complaint must be considered, and the principle is well established that the demurrer admits all the allegations of the complaint that are issuable and well pleaded. 8 Cal. 392; 24 Cal. 602; 22 N. Y. 472.

The complaint alleges, and the demurrer confesses, the following facts:

1st. That the charter of Butte was submitted to a vote of the tax-paying householders of said town at the time alleged, and was by them accepted by a vote of seventy-two in favor of, and fifty against, the acceptance of said charter.

2d. That the defendants named in the complaint as the mayor and common council of said city were elected by a vote of the tax-paying householders of said city at the time alleged.

3d. That at the time said elections were held, there were a large number of persons residents of said town of Butte, male citizens of the United States, above the age of twenty-one years, and qualified voters under the general law of the territory, but who were disqualified from voting upon the question of the acceptance of said charter and the officers of said city government because they were not tax-paying householders.

4th. That, in pursuance of the elections so held, a town or municipal government has been established over said town and its inhabitants; and that the persons named in said complaint as composing the city council have since exercised the powers conferred or attempted to be conferred upon them by the charter passed by the legislature for the incorporation of said town.

5th. The enactment by said city council of the ordinances mentioned in the complaint.

6th. The election or appointment of Charles S. Warren as police magistrate by said city council, and the exercise by him of the powers of such magistrate within said town, and pursuant to the ordinances enacted by said city council.

7th. The arrest and fine of the several relators named, for the alleged violation by them of ordinance number 10, enacted by said city council.

These facts being admitted, the demurrer, on the ground that the complaint does not state facts sufficient to constitute a cause of action, becomes in effect a demurrer to the evidence, and it was upon this theory that the cause was tried and decided in the district court, the court below sustaining the demurrer generally, and not upon any of the specific grounds alleged.

The question thus presented by this appeal and record is one of law only, and it is whether the acts of the defendants (the respondents in this court) find warrant and authority in the act of the legislature approved February 21, 1879, incorporating the town of Butte. In other words, whether this act of the legislature is or is not a valid law.

On the part of the appellants it is maintained that the law is invalid. First, because the charter was never lawfully submitted for the acceptance or rejection of the corporators named in the act.

Section 1 of article 1 of the act constitutes the "inhabitants of the city of Butte a body politic and corporate." The language is general, and embraces all the "inhabitants" of said town. But when the act comes to submit the charter to a vote of those who are thus created a body corporate, it singles out a particular class and submits to their vote only the decision of the question as to whether they will accept and live under the charter passed for their government. Charter, art. IV, sec. 2;

art. VII, sec. 23.   This, it is maintained, was an unprecedented and unauthorized mode of submitting a charter for acceptance or rejection.

The authorities are nearly or quite unanimous in holding that legislatures have the power to create municipal corporations and erect town governments over the inhabitants thereof, without submitting the question to the determination of the inhabitants who live under the government thus established; yet the submission of the question is often left to a vote of the inhabitants.   And such submission has not been regarded as a delegation of legislative power, which, under our system of government, is intrusted exclusively to the legislature, but a question merely as to the acceptance or rejection of a charter.   1 Dillon on Mun. Corp. sec. 23; Cooley on Const. Lim. p. 118, note 2, and cases; 26 N. Y. 472.

The charter may, in the first instance, embody the legislative will like any other law, but its taking effect as a law is made to depend on a vote of the inhabitants.   In all the cases that have been found in which public or municipal charters have been submitted for the acceptance of the people who are to live under them, the words "citizens," "inhabitants," "corporators" or "voters" are used, and these words, in a political sense, under our form of government, all mean the same thing.   1 Dillon, sec. 23, note.   Webster, Worcester, Bouvier and Burrill all define citizen, in a political sense, as one entitled to vote.

Chief Justice Taney, in *Scott* v. *Sanford*, 19 How. 404, says: "The words people of the United States and citizens are synonymous terms, and mean the same thing."

Conceding to its fullest extent, therefore, the right of the legislature to submit a municipal charter to a vote of the people or electors for their acceptance or rejection, it does not follow that they have the authority to single out a particular class of voters or property holders and make their will, or the will of a majority of them, the rule by which to determine whether the charter shall take effect

or not.  If the determination of the question can be sub-
mitted to a particular class, it can be submitted to indi-
viduals by name, or to a single individual, and thus
present the strange, and in this land unheard of, spectacle
of a government erected over a community at the will of
a single individual.

The theory upon which charters are submitted to a
vote of the people refutes the proposition that such gov-
ernments shall take effect from the will of a class only.

The great weight of authority is that a legislature can-
not submit a general law to a vote of the people so as to
make its taking effect as a law depend upon the vote of a
majority for or against it, and this on the well settled
principle that the duty of enacting laws has been confided
to the legislature, and this duty cannot be by them dele-
gated to another.   The case of *Barto* v. *Hemrod,* 8 N. Y.
483, and many later cases, abundantly establish this prop-
osition.   But the erection of municipal governments are
not classed as general laws, and have been denominated
auxiliary governments.   Such governments being local,
and auxiliary to the principal government under which
they exist, the rule that the legislature has not the power
to refer a general law to a vote of the people has been
uniformly held as not applicable to the submission of
town or city charters to a vote of the inhabitants living
within the corporation.   One, and no doubt the principal,
reason, why such acts are regarded as exceptions to the
rule that laws may not be submitted, is, that as the people
of the municipality have to bear the burdens of the local
government, and as the local legislation will affect them
much more intimately than the mass of the people, they
should have the right of deciding whether they want
such a government or not.

No authority has been found, and no law in any state
or territory, it is believed, exists, in which a charter for
the government of a town or city has been submitted —
if submitted at all — to a less number than the entire

body of qualified electors resident within the town or city. And the fact that writers on municipal law always speak of the submission of charters to the "people," "the inhabitants," "the voters," and other like terms, denoting that the submission was general, negatives the idea that it was ever partial, as in the present case. 1 Dillon on Mun. Corp. p. 23; Cooley's Const. Lim. p. 118.

Passing from the question of whether the charter was ever lawfully submitted to, and adopted by, the inhabitants of Butte, the second proposition which I make is, that the charter is illegal and unauthorized legislation, inasmuch as it attempts to deprive a portion of the inhabitants of said city, who are at the same time male citizens of the United States, and qualified voters under the general election law of the territory, from the right or privilege of voting under said charter and the government of said city. In this particular the charter enacted for Butte is exceptional legislation in Montana or elsewhere. Other charters have been enacted in this territory for the creation of town governments, but in all of them the entire body of voters, under the general law, living within the town were allowed to vote under the town government. This was the case in the charter passed for the government of Virginia City, and, more recently, of Helena.

The statute book in all the other territories is free from legislation of the kind, hence their reports are devoid of all adjudications on the subject.

We are forced to examine the question, therefore, in the light of reason rather than authority.

The first inquiry that presents itself in any consideration of the question of suffrage is, from whence is the right of privilege derived? What government confers, or can confer, or take it away?

No power is delegated by the constitution to the United States over the question, either to confer it upon, or withhold it from, any citizen of a state. The constitution

requires that the electors for members of the house of representatives in each state shall have the same qualifications requisite for electors of the most numerous branch of the state legislature; thus adopting the electors made by the state, and making them its own for the purpose of electing members of the house of representatives. The only other provision of the constitution directly relating to the subject is the fifteenth amendment, which is an inhibition upon the government of the United States and of the states against denying or abridging the right of citizens of the United States to vote on account of "race, color or previous condition of servitude." Aside from this restriction, all jurisdiction over the question within a state belongs to the state or people. McCreary, Law of Elections, p. 45 and cases; Story on Con. secs. 581, 582.

Within the states the qualifications requisite for suffrage are regulated in all cases by the constitution of the state, and the only authority which the legislature has, is to pass laws regulating the exercise of the right, and the regulations must be such as not to deprive of the right itself. McCreary, Law of Elections, p. 46, sec. 6; 58 Penn. 338; 60 Penn. 54; *Kennedy* v. *Wilmington*, 73 N. C. 198 (21 Am. Rep. 468); *Clayton* v. *Harris*, 7 Nev. 64; 12 Pick. 485; 39 N. Y. 429; Federalist, No. 52.

The rule being universal, that the qualifications of suffrage within the states are regulated by the different state constitutions, and not by the legislatures of the states, it follows that the *people*, in their primary capacity as the organizers and founders of government, or, in other and popular language, the people as sovereigns, as the source of political power, have reserved this question to themselves, and not delegated it to any government; constitutions being the embodiment of their will, having been ratified directly by their votes; the only restriction on the will and power of the people being the fifteenth amendment to the constitution, and that other

provision which guaranties to each state a republican form of government.

The constitutions of the states do not, however, solve the question in the territories.   Here we have no constitution.   The people as such do not possess sovereign power.   In the theory and practice of the government of the United States, a territory is a region of country acquired by the United States, by cession or conquest, and which has not the requisite population for admission into the Union as a state, and over which, from necessity, the United States exercises control, and holds in trust for all citizens and others going there to live, until they are sufficient in number to be entitled to admission into the Union as a state.   The power thus exercised has been sometimes attributed to that provision of the constitution which authorizes congress to make all needful rules and regulations respecting the territory or other property belonging to the United States, but the better opinion seems to be that it is an implied power growing out of the treaty-making power of the government.   The right to govern being held as an incident of the power to acquire new territory.

Whatever the source of the power, it has been too long exercised to be now questioned, and the various acts of congress, and decisions of the supreme court of the United States in regard to them, furnishes the only rule by which the power which congress may exercise over the territories, or people resident therein, can be determined.

A single expression used by Chief Justice Marshall in, the case of *The American & Ocean Insurance Co.* v. *Canter*, 1 Pet. 511, wherein (speaking of a territorial court of the then territory of Florida), he said, " In legislating for them congress exercises the combined powers of the general and of a state government," has been many times treated as conferring upon congress absolute and wholly discretionary powers over the territories.

But this expression and its context, as well as the facts in reference to which it was used, underwent thorough examination by the same court in the later case of *Scott* v. *Sanford*, 19 How. 445. And the court there held that the language referred only to the power of congress to establish courts within the territory, and to confer upon them such jurisdiction as it saw proper. That in doing this congress exercised the "combined power of the general and state government."

The case of *Scott* v. *Sanford* is in some respects the most memorable ever decided in the country. In its influence and effect upon the public mind and the politics of the country, it is without parallel.

The facts are too familiar to require any extended notice. Dred Scott was a negro slave, owned in Missouri, and whose master took him first to the military post at Rock Island, in the state of Illinois, and afterwards to Fort Snelling, in the territory of Upper Louisiana, and from there returned with him to the state of Missouri. Scott, after his return to Missouri, instituted suit in the circuit court of the United States to recover his freedom, on the ground that congress, by the act of 1820, commonly known as the Missouri compromise act, had prohibited slavery in all the territories of the United States lying north of the line of 36° 30'; and that his master had forfeited ownership over him by taking him into territory in which slavery was interdicted by act of congress. The principal questions involved in the case were: First, whether the plaintiff was a citizen of the United States, and as such entitled to sue in a court of the United States. Secondly, the constitutionality of the act of congress which prohibited the introduction of slavery into the territories north of 36° 30'. The decision of the court was adverse to the plaintiff on both grounds.

The case has become historical, and the bitter political and sectional feelings it awakened at the time have nearly or quite passed away. The fiat of war, crystal-

lized into a constitutional amendment, has given to Dred Scott and his descendants, for all time, that liberty which his suit failed to secure. And no doubt its failure contributed more successfully to that end, and to the emancipation of his race, than its success could have done.

More remarkable still will be the fact, if the decision of his cause shall in the end be the means of promoting and establishing the rights and privileges of that race which enslaved his own. In his case, speaking of the powers of congress over the territories, the court says, on p. 447:

"The power to expand the territory of the United States by the admission of new states is plainly given; and in the construction of this power by all the departments of the government, it has been held to authorize the acquisition of territory not fit for admission at the time, but to be admitted as soon as its population and situation would entitle it to admission. It is acquired to become a state, and not to be held as a colony, and governed by congress with absolute authority. As the propriety of admitting a new state is committed to the sound discretion of congress, the power to acquire territory for that purpose must rest upon the same discretion; and as there is no express regulation in the constitution defining the power which the general government may exercise over the person or property of a citizen in the territory thus acquired, the court must necessarily look to the provisions and principles of the constitution, and its distribution of powers, for the rules and principles by which its decision must be governed. Taking this rule to guide us, it may be safely assumed that citizens of the United States who migrate to a territory belonging to the people of the United States, cannot be ruled as mere colonists, dependent upon the will of the general government, and to be governed by any laws it may think proper to impose. . . . A power in the general government to obtain and hold colonies, and dependent territories, over which

they might legislate without restriction, would be incon-
sistent with its own existence in its present form. What-
ever it acquires, it acquires for the benefit of the people
who created it. It is their trustee acting for them, and
charged with the duty of promoting the interests of the
whole people of the United States in the exercise of the
powers granted them."

Further on, on page 449, the court says:

"The power of congress over the person or property
of a citizen can never be a mere discretionary power
under our constitution and form of government. The
forms of the government and the rights and privileges
of the citizens are regulated and plainly defined by the
constitution itself. And when the territory becomes a
part of the United States the federal government enters
into possession in the character impressed upon it by
those who created it. It enters upon it with its powers
over the citizens strictly defined and limited by the con-
stitution, from which it derives its own existence, and
by virtue of which alone it continues to exist and act as
a government and sovereignty. It has no power of any
kind beyond it; and it cannot, when it enters a territory
of the United States, put off its character and assume
discretionary or despotic powers which the constitution
had denied it. It cannot create for itself a new char-
acter separated from the citizens of the United States,
and the duties it owes them under the provisions of the
constitution.

"The territory being a part of the United States, the
government and the citizens both enter it under the
authority of the constitution, with their respective rights
defined and marked out; and the federal government can
exercise no power over his person or property beyond
what that instrument confers, nor lawfully deny any
right which it has reserved." 2 Dal. 304; 1 Nat. Digest,
525. 20, 21.

Reasoning like this amounts to demonstration. Noth-

ing can add to its force, or do away with its conclusiveness. Let it be remembered, too, that the language was used in reference to slavery and the power of congress to prohibit its introduction in the territories — an institution which did not exist in more than one-half the states, and which was reprobated by a vast majority of the people of the United States.

How much more powerful and convincing does the language of the court become when applied to the preservation of a right which all recognize, than to the perpetuation and extension of a wrong which the great majority condemn!

In the light of this opinion will it be urged, or can it be maintained, that while congress has no power to deprive any citizen of the United States of the right of taking and holding in a territory property in slaves, they yet have the power to deny to citizens the right to vote on matters of local concern? and to draw distinctions between citizens based on the possession of a particular kind of property? If so, from what article or section of the constitution is the power derived? I have already shown that the constitution delegates no authority whatever to the general government over the question of suffrage within a state, and the decision in the Dred Scott case, from which I have quoted, shows that congress cannot govern arbitrarily, or at its discretion merely, the people of a territory. The language of the court is, "that the federal government can exercise no power over his person or property beyond what that instrument (the constitution) confers, nor lawfully deny any right which it has reserved."

The case of *Miner* v. *Happusett*, 21 Wall. 162, lays down clearly the doctrine that the general government has no control over the question of suffrage within a state, and that the right of voting was not one of the privileges or immunities which the fourteenth amendment to the constitution was intended to guard and

protect. And at another place declares that "the constitution of the United States has not conferred the right of suffrage upon any one. And the United States have no voters of their own." The tenth amendment to the constitution declares that the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people. If this provision be considered in connection with the decision in Miner against Happusett and with the language of the court, last quoted, in the Dred Scott case, the conclusion is irresistible that the general government have no power to confer suffrage upon any one within a state, nor power to deny it to any one in a territory who is a citizen of the United States and of proper age to exercise the right; but that the right within a territory is one which, by the tenth amendment, is "reserved by the people."

The constitution has always been remarked for the accuracy and felicity of its language, and unless there were rights which the people possessed, and which they had not conferred upon any government, why in this amendment use the language it does when it says "reserved to the states respectively, *or to the people ?*"

If the proposition be true, that congress cannot deny to a citizen in a territory the right to vote, my next proposition is one that results from it, and is this: that congress cannot create a government within a territory with greater power than congress itself possesses ; or, speaking exactly, if congress cannot deny this right to a citizen, it cannot confer power on the territorial legislature to do so.

The government erected over a territory is one proceeding entirely from congress and not from the people of the territory. Of the three co-ordinate branches of which a territorial government is composed, two — the executive and judicial — are composed of persons appointed directly by the United States, in the selection of

whom the people of the territory have neither voice nor consideration. For the most part the appointees to these offices have never lived in the territory, and their nomination to office by the president usually designates them as citizens of some other state. The appointees, and the mode of appointment, resemble more those sent by the government of Great Britain to rule over her remote dependencies than they do officers chosen within a state by the voice of the people.

The remaining branch — the legislature — are chosen by the people; but they also are subject to the power that created them. Congress regulates the length and frequency of their sessions, pays their *per diem*, publishes or fails to publish their laws; and, lastly, reserves the right to nullify their enactments if it does not approve them.

To call such a system a government at all is something of a travesty on the name of government, but to call it a government of the people is wider still of the mark. Sometimes these organic acts are spoken of as the constitution of a territory. This is a greater solecism than to call the government under it a government of the people. A constitution, as understood in our country, is paramount and fundamental law, emanating from the people themselves, defining and limiting the powers of the government which it creates. Coming from the people, and embodying their will, no other power can amend or supersede a constitution which they have once created. To call an act of congress a constitution leads only to confusion. Congress itself is but a legislative body, enacting laws in obedience to a constitution, and with no power in the instrument which creates it, to enact constitutions for the territories or any other region. The laws they pass establishing governments within a territory have the same and no greater force than any other of their enactments. They must be subject to the constitution. They are at all times liable to repeal or amendment. If

they conflict with a later enactment they must give way. The rules of construction which apply to all laws apply also to them. And finally, they cease to exist without being repealed, whenever the people are invested with the right of local government. In this particular these laws have less dignity than others which congress are authorized to enact. In view of their nature, it is a perversion of terms to liken them to constitutions. Constitutions are uniformly preceded by a preamble reciting in substance, and generally in exact words: "We, the people, do ordain and establish the constitution." Mr. Webster, in one of his great constitutional arguments in the senate of the United States, attached great importance to the preamble of the constitution of the United States on this account, as showing that it was created by the people and not by the states, and this is now the accepted doctrine by all parties and sections.

The question as to the nature and power of territorial governments came before this court as far back as 1874, in the case of *The Territory* v. *Lee*, in which his honor, the present chief justice, rendered the decision, in which, with a conclusiveness and force of reason which I cannot hope to imitate, demonstrated the proposition I have here sought to establish. 2 Mont. 132.

By the fifth section of the organic act congress has conferred, or attempted to confer, upon the legislative assembly the power to fix the qualifications of voting and holding office at all elections after the first. The legislature, at the ninth session, passed an act regulating elections, the first section of which provides, "that all male citizens of the United States, above the age of twenty-one years, and all persons of the same age who shall have declared their intention of becoming citizens, and who under the existing laws of the United States may ultimately become citizens thereof, shall be deemed electors of this territory, and be entitled to vote for delegate to congress and for territorial, district, county and pre-

cinct officers, provided they shall have resided in the
territory three months, and in the county where they
may offer to vote thirty days preceding the day of elec-
tion."

This act conferred the right of suffrage upon the same
class that congress at first conferred it by the section of
the organic act mentioned.   And the act is substantially
the same as the constitutions of nearly all the states.
And if there is such a thing as common American law
resulting from unanimity throughout the country, this
act was the reaffirmation of it.   Minors and females
were excluded from voting because they are excluded
almost everywhere else.   No property qualification was
established, because these have been elsewhere abolished,
though they at one time existed in most of the older
states.   A brief residence in a fixed locality was required,
as an evidence that the elector was not a mere transient
person passing through the territory.

This general law was in force throughout the territory
when the charter of Butte was passed; and in addition
to the reasons already urged against the latter act, it is
subject to the further objection that it is partial and un-
equal legislation, and for this reason should be declared
void.   Can any reason be given why a citizen of the
United States, resident in the town of Butte, should not
have the same political rights and privileges as a citizen
of the United States residing in Virginia City or Helena?
Yet the legislature has accorded to all electors, made
such by the general law referred to, the right of voting
under the municipal governments erected over them, but
have limited the right in Butte to a special property
class.   Mr. Justice Curtis, in his opinion rendered in the
Dred Scott case, speaking of the right to vote, says:
" There can be no doubt that the right to vote is one of
the chiefest attributes of citizenship under the American
constitutions, and the possession of this right is decisive
evidence of citizenship."

All standard lexicographers, as has already been seen, speak of voting as one of the rights pertaining to citizenship. To deprive of the right is, then, to lessen the value of citizenship; and this of itself becomes partial and unequal legislation.

John Locke — a memorable name, and a benefactor of his race — more than a hundred years ago said of those who make laws: "They are to govern by promulgated established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plough."

Mr. Cooley, in his able work on constitutional limitations, quoting with approval the above · passage from Locke, adds: "And this may be justly said to have become a maxim in the law, by which may be tested the authority and binding force of legislative enactments." Pages 392, 393.

Judged by this standard alone, this law cannot stand, without conceding that it would have been valid had it been general instead of being local and partial.

Another principle intimately connected with this, which is inwoven into all American ideas of government — which forms, indeed, the basis on which American governments are founded,— is that of perfect equality of rights and privileges. Whether voting be an absolute right or not, it certainly is a political privilege. The fifteenth amendment to the constitution calls it a "right," and it cannot be forgotten what scrupulous consideration was given to the phraseology of the recent amendments before they were finally submitted by congress to the states for ratification. The constitutions of all the states contain, a bill of rights in which this equality of rights or privileges is securely guarded by fundamental law; but were it omitted, it is equally part of the American idea of government. The force, as well as universal prevalence of this thought, was illustrated in the case of the organization of the government of California. The dis-

covery of gold attracted there suddenly a large immigra-
tion.    There was neither constitution nor law in existence.
The Mexican law and authorities had been displaced,
and congress had substituted nothing in its stead.   What
the people did, under the circumstances, was to put
in practice the American ideas of government which
they took with them to the country.    They elected dele-
gates to a convention to frame a constitution of govern-
ment, and in this election all citizens of the United
States, upwards of twenty-one years of age, took part.
After the constitution had been framed, in accordance
with other American precedents, it was submitted for
the acceptance of the same class that called the conven-
tion into being, and was by them ratified.    It was done
spontaneously, and without any law or authority except
such as was inherent in American citizens, and in the ex-
igency of their situation.    A colony of Englishmen, under
the same circumstances, would doubtless have waited for
a royal charter before taking action, and in the mean
time have remained in a state of anarchy; such being
the different theories of the two peoples in regard to their
rights and the source of sovereign power.

The government of the United States has clearly de-
fined its position on the question of suffrage in this and
other territories by conferring it in the first instance upon
all its citizens of the age of twenty-one years and on all
who have declared their intention to become citizens.    If
more were wanting, as evincing the theory and policy of
the government in this respect, it is found in the fifteenth
amendment and in section 2004 of the revised laws of the
United States, which enacts that, "All citizens of the
United States who are otherwise qualified by law to vote
at any election by the people in any state, territory, dis-
trict, county, city, parish, township, school district, munic-
ipality, or other territorial subdivision, shall be entitled
and allowed to vote at all such elections, without distinc-
tion of race, color, or previous condition of servitude,

any constitution, law, custom, usage, or regulation of any state or territory, or by or under its authority, to the contrary notwithstanding."

This statute was enacted in order to carry out the provisions of the fifteenth amendment, and certainly if a statute can be framed which is full and sweeping in its application, this one is so.

Upon reason it might be urged that the failure to own a particular kind of property should not be a cause of political disability any more than to be born black or any other color.

It is a rule of construction in all statutes which affect personal rights or personal liberty, that the one should be adopted which will preserve and not destroy those rights whenever this can be done. Applying this rule to the fifth section of the organic act (if we take into consideration the other legislation of congress which has been referred to), we are not left in doubt about the power which congress intended when it conferred upon the legislative assembly the power of prescribing the qualifications of voting and holding office at all elections after the first. The power intended was that of regulation and not of destruction — the power to establish rules for the exercise of a right, and not to take away the right itself. Otherwise the legislative assembly is omnipotent. It can disfranchise at pleasure, and confer upon or withhold the right of voting from any part of the people. If it can say that only tax-paying householders shall vote within a town government which it creates, it can equally say that only the owners of ranches shall have the right of voting for county officers, and only merchants and bankers for members of the legislature. They can go further than this, even, and limit suffrage to themselves alone, and thus secure to themselves permanence in office, and relieve all others from the cares and burdens of state. If they can create one, they can create as many separate little oligarchies as there are towns in the territory. And in

this way they can destroy republican government in a
territory by the creation of a special property and govern-
ing class.  To assume power like this for a territorial leg-
islature is to assume too much, and the illustrations given
show the fallacy of any arguments based on such an as-
sumption.  If it be true, as the supreme court say in
*Scott* v. *Sanford,* that the government of the United
States holds the territory in trust for the people of the
United States, and that the United States cannot confer
any rights or privileges on one class of citizens which it de-
nies to another, by what possible power can a territorial
government — the agent of the government and not of
the people, as I have already shown — confer special
privileges on one class which it withholds from another ?
To maintain a doctrine like this is to maintain that the
power of the agent is greater than that of the principal.

If it be asked what the limit is to legislative power in
this respect in a territory, I answer that the constitution
and laws of the United States, the decisions of the su-
preme court under them, and the nature and genius of
our institutions, prescribe a limit.  The nature of legisla-
tive powers and duties prescribe a limit.  Without express
authority and from an authorized source, they cannot
legislate to destroy political rights which already exist,
any more than they would be authorized to take private
property for public use without due process of law.  On
this subject of legislative power the supreme court of the
United States says:

" I cannot subscribe to the omnipotence of a state leg-
islature, or that it is absolute and without control, al-
though its authority should not be expressly restrained
by the constitution or fundamental law of the state.  The
people of the United States erected their constitutions, or
forms of government, to establish justice, to promote the
general welfare, to secure the blessings of liberty, and to
protect their persons and property from violence.  The
purposes for which men enter into society will determine

the nature and terms of the social compact, and *as they
are the foundation of the legislative power, they will
decide what are the proper objects of it.    The nature
and end of legislative power will limit the exercise of it.
. . . . ˙˙ There are acts which the federal or state leg-
islature cannot do without exceeding their authority.
There are certain vital principles in our free republican
government which will determine and overrule an apparent
and flagrant abuse of legislative power.    An act of the
legislature (for I cannot call it a law) contrary to the
great first principles of the social compact cannot be con-
sidered a rightful exercise of legislative authority.   .The
obligations of a law in governments established on ex-
press compact, and on republican principles, must be de-
termined by the nature of the power on which it is
founded."   Calder* v. *Bull*, 3 Dall. 270.

How exactly does this language apply to the law now
in question, and with what certainty does it pronounce
its condemnation.    Mark the language of the court.    It
speaks not only of the compact of government, the consti-
tution which makes us a nation, but of " vital principles
in our free and republican governments."    This may be
called vague and general language.    It may be said to be
a " glittering generality."    The character of the tribunal
which used the language negatives any criticism imply-
ing that what they say is said for popular effect, or other-
wise, except as its matured judgment in the enunciation
of legal principles.    Suppose within a state the constitu-
tion was silent on the question of suffrage, and contained
no prohibition upon legislative power, does any one sup-
pose that the legislature could then disfranchise any class
of voters?    If they could, they are mightier than the
voters who made them legislators.    The state of Rhode
Island, up to the year 1842, existed under the charter
granted them by Charles II in 1663.    This charter con-
ferred the right of suffrage only on persons possessed of
a freehold estate, and, being a grant from the crown, did

not provide for any change or amendment, as it could not. The people of the state had oftentimes petitioned the legislature to pass an act authorizing the people of the state to elect delegates to a convention to frame a constitution to be submitted to a vote of the people, and which, if ratified, should supersede the charter. But the legislature, composed as it was of the privileged class, disregarded these petitions, and the people finally took action themselves, elected delegates to a convention which framed a constitution, under which they proceeded to ratify and elect officers. This new constitution did away with the objectionable feature in the old charter, and conferred the right of voting on all citizens of the proper age. Although this act of the people was held by the courts of the state to be revolutionary, and the constitution thus framed did not take effect, it yet led the legislature of the state to act, and a constitution was framed in conformity with an act passed for the purpose, which was approved by the people and superseded the old charter.

The matter came near leading to a revolution within the state, and it all grew out of the denial of suffrage to its citizens. *Wilkinson* v. *Leland,* 2 Pet. 656; *Luther* v. *Borden,* 7 How. 34.

The case of *Tungman* v. *Chicago,* 78 Ill. 405, illustrates the principle that the legislative power is not supreme or unlimited, although they may violate no constitutional provision. The legislature of Illinois undertook to establish a board of health for that city, to be composed of a number of physicians to be selected and appointed by the members of the superior court; the board of health so appointed to have the power to enact ordinances for the preservation of the health of the inhabitants of the city. The validity of this act was questioned and the supreme court of Illinois decided it to be invalid, on the ground that it deprived the people of the city of self-government, and that the act was repugnant to our

theory of government. In principle that case did not differ from the present. In one the judges of the superior court selected the persons who were to frame the ordinance; here the tax-paying householders select them. In both the people are deprived of the right of self-government. It matters not that the elective body may have been larger in one case than in the other. So long as a class of citizens, or a single citizen, without cause, is deprived of the right of voting, it is a violation of the right of local self-government.

The validity or invalidity of a legislative act cannot depend upon the number of persons whose rights it violates. The body of the people hold their privileges by no other or different tenure from that by which each individual comprising the body holds his. An act which violates the rights of ten men cannot be justified because it does not violate the rights of a hundred.

In deciding a question as important as the present, the court will take into consideration the spirit and intention of the legislature as well as the letter of the act, and if, from this, the court is of opinion that congress, by the fifth section of the organic act, intended to confer upon the legislative assembly the power to prescribe regulations for the exercise of the right of suffrage, and not the power to take away the right from a large class of citizens, upon this view, the court will declare this charter invalid. And in determining this point the court will look not only at the law itself, but will also take into view contemporaneous as well as subsequent legislation on the same subject. The organic act of the territory was passed by congress in 1864. At that time there had been little agitation and no very great interest felt about suffrage as a matter of national concern. But that interest became more important than all others immediately after the close of the war. In the opinion of the then dominant party, the freedmen of the south, then newly emancipated, if left under the absolute control and

government of the white race, would be subjected to a fate nearly or quite as hard as they had endured while in a state of slavery.    To prevent this, and in order to give to the freedmen the means of protecting themselves against oppressive legislation, the fourteenth and fifteenth amendments were passed.

The right of voting has been termed, not inaptly, "the right preservative of rights." And it was upon this theory that the people of the country acted when they passed the fifteenth amendment to the constitution. Without this amendment, it was thought that the liberty which had just been conferred might prove an empty boon.    If voting, then, is a means of preserving rights, the deprivation of the right to vote is equivalent to deprivation of rights themselves.

Shylock, with unerring truth and logic, said:

> "You take my house when you do take the prop
> That doth sustain my house:  You take my life
> When you do take the means whereby I live."

Then, again, section 2004 of the Revised Statutes, already referred to, shows conclusively that, as far as the government of the United States is concerned, its policy is to do away with all distinctions between its citizens and confer equal rights and privileges on all.    If we turn from the United States to the state governments and the legislation of other territories, we find that here also, without exception, there has been of late years an enlargement and nowhere an abridgment of the right of suffrage.    At the time of the adoption of the constitution of the United States, most of the constitutions of the original states required property qualifications of some kind as a condition of voting.    In nearly, if not all, these constitutions have been amended in conformity with the more modern idea that ours is a government of men and not of property.    The state of Massachusetts — certainly not behind any of her sisters in enlightenment and advanced thought — by an act of one branch of her legisla-

ture recently proposed a further enlargement of the liberty of her citizens by conferring the right to vote on females. And this has actually been some time done in the neighboring territories of Utah and Wyoming.

Of all the states and territories, Montana only has gone backward, and here only, as has been said, in a single act, and within a particular locality. I do not refer to legislation elsewhere as any direct authority here, but as showing the tendency and drift of public opinion elsewhere on this question. It might not, however, be inappropriately urged, in view of the fact that, as the government of the United States has declared, by its highest judicial tribunal, that the territory of the United States is held by it in trust for the benefit of all its citizens, that it is incompetent for a part of those citizens to deprive others of rights which a portion enjoy, the effect of which would be to subject a region large enough for an empire to the control of a class, and thereby prevent the settlement of a territory. It requires no argument to prove that the deprivation of the right to vote would of itself deter many citizens from going into either a state or territory to locate, and the policy of the government is to promote and not retard the settlement of the territories.

In another sense the act in question should be held void. Our government has for its foundation the respect and attachment of its citizens. These constitute at once its strength and value. Deprive the citizen of the right of voting, and you weaken, if you do not destroy, his attachment for our institutions and laws, and to that extent you weaken and impair the government itself. This branch of the subject suggests and tempts to a discussion which time will not permit of.

Speaking on the subject of local government by the people, De Tocqueville, in his great work, "Democracy in America," says:

" Local assembly of citizens constitutes the strength of

free nations. Municipal institutions are to liberty what primary schools are to science; they bring it within the people's reach, and teach men how to use and how to enjoy it. A nation may establish the system of free government, but without the spirit of municipal institutions it cannot have the spirit of liberty."

See, also, remarks of Ruffin, J., in 4 Jones' (N. C.) Eq. 323, cited by Cooley in his work on Municipal Corporations, p. 82, note 3; id. p. 89.

It was strenuously urged in the court below that this charter should be sustained because of the influx of vicious persons and criminals within the territory. This might be a reason for the enactment of more stringent laws against crime, but not for sustaining this charter.

The vice of the argument is that it confounds crime with honest poverty, and punishes a man for not owning a house just as it would if he had committed and been convicted of crime. It adds insult to wrong, and heaps humiliation on misfortune.

No plea of necessity can be successfully urged in support of a law that violates personal rights or fundamental principles. And the greatest necessity at all times exists why such enactments should be declared void. Where courts do this, and leave to other departments the correction of public ills, they will have performed their whole duty.

Briefly to recapitulate the points on which I rely for the reversal of the judgment of the district court, I maintain:

*First.* That the charter of Butte was never submitted to a vote of the corporators or qualified voters residing in said town, and has never been accepted by them.

*Second.* That congress has no authority, under the constitution of the United States, to deprive any male citizen of the United States, of suitable age, of the right of voting at any election held within one of the territories of the United States, unless it be in punishment for crime.

*Third.* That a territorial government is a government erected by congress over a territory, and derives none of its powers from the people. That congress cannot confer on such a government greater powers than itself possesses.

*Fourth.* That the right of voting is the highest attribute of a citizen, and is the act by which the sovereign power of the people is manifested. That no power exists under our form of government to deprive any citizen of this right, until the people themselves deny or abridge the right through a constitution adopted by themselves. That this power of the people is limited by the constitution adopted by the United States to this extent,— that they can establish no government that is not republican in form.

*Fifth.* That in the absence of constitutional or other restraints on legislative power, such power is limited by the nature of free government, and the fundamental principles of liberty on which it rests. These, and the nature and end of legislative power, furnish a limit to the exercise of it. That the act in question is in violation of those free principles, and for this reason was beyond legislative power.

*Sixth.* That the charter passed by the legislature for the town of Butte is partial and unequal legislation, inasmuch as it deprives a portion of the citizens of said town of the same privileges which it accords to others, of voting for officers of the town government.

*Seventh.* Said act is further partial and unequal in this — that it establishes a different standard of voting in said town from what exists in any other towns, or elsewhere in the territory.

*Eighth.* Said act is anti-republican in character, and erects an oligarchy within the limits of said town and over the inhabitants thereof.

WADE, C. J. The act incorporating the city of Butte provides, article IV, section 2 (Session Laws, 1879),

as follows: "All citizens of the United States, and those who have declared their intention to become such, of twenty-one years of age, who shall be tax-paying householders, and who shall have been actual residents of said city three months preceding said election, shall be entitled to vote for city officers and the adoption of this charter."

The validity of this act of incorporation is called in question principally for the reason that it limits and restricts the right to vote upon the proposition to adopt or to reject the charter to the tax-paying householders who shall have been actual residents of the city for three months preceding the election.

1. The organic act vests all legislative power of the territory in the governor and legislative assembly. The qualifications of voters and of officers (after the first election) are such as shall be prescribed by the legislature. The legislative power of the territory extends to all rightful subjects of legislation consistent with the constitution and the organic act of the territory. The power to make laws, limited only by the boundaries of the constitution and the organic act, resides with the legislature, and there it must remain. But it is no violation of the principle that the legislature may confer upon municipal organization certain powers of legislation concerning local regulation, for such municipal governments are mere auxiliaries to the state government in the business of municipal rule.

It is another well-settled principle that the legislature may create municipal organizations and governments upon its own motion, consulting only its own views as to the propriety or necessity of such action, and without the consent and against the protest of those upon whom such government is to take effect. Cooley's Const. Lim. 143.

The theory of a government by the people is that they act through their representatives. They delegate their

authority to their agents, who speak and act for them in making laws. The act of an agent, within the scope of his authority, binds the principal. Hence, laws enacted by a properly constituted legislature, within the scope of its authority, and not in conflict with the constitution or organic law, bind the people. They give their consent to laws by clothing their agents with power and authority to make them. There is no reserved power in the people to consent to or reject laws properly enacted by their lawfully constituted agents. If they object to the laws for the reason that they are not within the limits of the organic law, they may have that question determined in the proper tribunals; if they object to them because they are oppressive, or do not fulfil their expectations, they may elect new agents to alter or abolish them, and to enact others in their places.

It is within the competency of a territorial legislature to create municipal corporations. Its authority extends to all rightful subjects of legislation. It may provide municipal courts, although by the organic act it is declared that the judicial power of the territory shall be vested in a supreme court, district courts, probate courts and justices of the peace. 1 Dillon on Mun. Corp. sec. 18, citing *State* v. *Young*, 3 Kans. 445; *Barnes* v. *Atchison*, 2 id. 454; *Reddick* v. *Aurelia*, 1 Mo. 5; *Vincennes University* v. *Indiana*, 14 How. 268; *Vance* v. *Bank*, 1 Blackf. 80; *Myers* v. *Bank*, 20 Ohio, 283; *Deitz* v. *City*, 1 Cal. 323.

The same author further says: "The rule which applies to private corporations, that the incorporating act is ineffectual to constitute a corporate body until it is assented to or accepted by the corporators, has no application to statutes creating municipal corporations. These are imperative and binding without any consent, unless the act is expressly made conditional. All who live within the limits of the incorporated district are bound by them, and can only withdraw from the corporation by

removal.    Over such corporations the legislature, unless restrained by the constitution, has entire control; and, unless otherwise provided by the act itself, or a different intention is manifested, the public corporation is legally constituted as soon as the incorporating act declaring it to exist goes into effect.    1 Dillon on Mun. Corp. sec. 23; *Medical Institute* v. *Patterson*, 1 Denio, 61; 5 id. 681; *Myers* v. *Irwin*, 3 Serg. & R. 368; Angell & Ames, sec. 79, and cases cited;    *Wells* v. *Burbank*, 17 N. H. 393; *Society, etc.* v. *Town of Paulet*, 4 Pet. 480.

Having this authority, it has been doubted whether the legislature had the lawful right to submit the question of the adoption or rejection of a municipal charter to the people for whom it was created; but the weight of authority is, and the practice is now general, to submit to those interested, and who are to take upon themselves the burdens imposed by a municipal government, if the same is established, the question as to the adoption or rejection of the charter.    And this is not the delegation of legislative authority to the people.    It is merely attaching a condition to the law and providing that it shall take effect upon the happening of a certain event.    1 Dillon's Mun. Corp. sec. 23.

The legislature having absolute authority to establish a municipal government for a town or city without consulting the people of such town or city, or obtaining their consent, it follows that the legislature may cause the establishing of such municipal government to depend upon the happening of any future contingency or event.

It is objected that this act of incorporation did not become a law by virtue of the will of the legislature, but by virtue of the will of the people to whom the question of its adoption was submitted.    This objection is not supported by authority.    The legislature may attach such conditions as to the taking effect of laws as it sees proper.

In the case of *Slack* v. *The M. & L. Railroad Co.*

13 B. Mon. 23, the court says: "It is not essential to the character and force of a law that the legislative enactment should itself command to be done everything for which it provides. The legislative power to command a particular thing to be done includes the power to authorize it to be done. The act done under authority conferred by the legislature is precisely as legal and valid as if done in obedience to a legislative command. Each is entitled to the same force and efficacy, and each must be followed by all the consequences which, either by the general law or by the particular statute, are annexed to the particular law, because such is done in effectuation of the legislative will, and each, when done according to that will, has all the sanction which the legislative power can give. Each is, therefore, entitled to the aid of the whole power of the government to uphold it, and to maintain the rights flowing from it. A peremptory statute is at once mandatory and requires obedience, and thus is at once a perfect law in all respects. A statute giving authority to do or not to do, and presenting the consequences of the act done, has not, until the act is done, any mandatory effect requiring immediate obedience, except so far as it regulates the time and manner of doing the act, and expressly or impliedly commands that the agent shall not be prevented from doing it according to the discretion allowed. Beyond that it has not a mandatory effect till the act is done, and is not, until then, a perfect law as to all the purposes provided for. In other words, it does not take its final effect as a mandatory law until the discretionary act is done, upon which it is to have its final and peremptory operation. So far as such a statute confers authority and discretion, it is as obligatory from the first as the legislative power can make it. And although its further practical efficacy may depend upon the discretionary act of some other body or individual, it is not derived from that discretion,

but from the will of the legislature which authorized the act and prescribed its consequences."

In *Burr* v. *Blanding*, 14 Cal. 357, the court says: "Laws may be absolute, dependent upon no contingency, or they may be subject to such conditions as the legislature may impose. They may take effect only upon the happening of events which are in the future and uncertain; and among others, the voluntary act of the parties upon whom they are designed to operate. They are no less complete and perfect, when passed by the legislature, though future and contingent events may determine whether or not they shall take effect."

In *Smith* v. *The City of Janesville*, 26 Wis. 294, the court says: "No one doubts the general power of the legislature to make such regulations and conditions as it pleases with regard to the taking effect or operation of laws. They may be absolute or conditional and contingent; and if the latter, they may take effect on the happening of any event which is future and uncertain."

In *Mores* v. *The City of Reading*, 21 Pa. St. 202, the court says: "Half the statutes on our books are in the alternative, depending on the discretion of some person or persons, to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law."

In *C. W. & Z. R. R. Co.* v. *Commissioners of Clinton County*, 1 Ohio St. 88, the court said: "The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution to be exercised under and in pursuance of law. The first cannot be done; to the latter, no valid objection can be made."

In *Hobert* v. *Sup'rs, etc.* 17 Cal. 31, the supreme court of California says: "The general principle is unquestionably

true, that our system is not a pure democracy, but a representative republican government, one of whose departments — the legislative — has the exclusive faculty of enacting laws. But the legislative department, representing the mass of political powers, is no further controlled as to its powers, or the mode of their exercise, than by the restrictions of the constitution. Such restrictions must be shown, before the action of the legislature, as to fact or mode, can be held invalid. Accordingly, the legislature, having this general power of enacting laws, may enact them in its own form, where not restrained, and may give to them such effect, to be worked out in such a way and by such means as it chooses to prescribe. It may provide that a law shall go into effect at one time or another, absolutely or on condition, upon certain terms or in a certain event, or without regard to future events."

Says the supreme court of Pennsylvania in *Locke's Appeal*, 72 Pa. St. 498, by Agnew, J.: "The true distinction I consider to be this: The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government.

"There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation. Hence the necessity of municipal divisions of states into counties, townships, cities, wards, boroughs and districts, to which is committed the power of determining many matters necessary· or merely useful to local welfare. Can any one distinguish between committing the determining power to the *authorities* of the district and to the people of the district? If the power to determine the expediency or necessity of granting

licenses to sell liquors in a municipal division can be committed to a commission, a council or a court, which no one can dispute, why cannot the people themselves be authorized to determine the same thing? If a determining power cannot be delegated, then there can be no power delegated to city councils, commissioners and the like, to pass ordinances, by-laws and resolutions in the nature of laws, binding and affecting both the persons and the property of the citizens. If a determining power cannot be conferred by law, there can be no law that is not absolute, unconditional and peremptory; and nothing which is unknown, uncertain and contingent can be the subject of law."

These cases have been cited to show, first, that it is within the competency of legislative authority to enact laws, the taking effect of which may be conditional or contingent, depending upon some uncertain future event; and second, that it is competent for a legislature to delegate to one man or to a certain designated body or class of men, or to the whole people, the question as to when the contingency or event has or shall take place. And such determination is not in any sense the making of the law. It is declaring when a law already made shall go into effect.

In this case the charter had already been enacted. It was perfect and complete in all its parts. It establishes a local government for the city of Butte, defines its authority and prescribes its powers. It was a law. The people of Butte, and no class or portion of them, had any discretion in the matter. They could not add to or take from the law as enacted. The only question submitted to the tax-paying householders was as to when the law should take effect. They had no discretion as to what the charter should contain. That had already been determined by the law-making power. "In what does this discretion consist? Certainly not in fixing the terms and conditions upon which the act may be performed, or

the obligations thereupon attaching.   These are all irrev-
ocably prescribed by the legislature, and, whenever called
into operation, conclusively govern at every step taken.
The law is therefore perfect, final and decisive in all its
parts, and the discretion given only relates to its execu-
tion.   It may be employed or not employed; if employed,
it rules throughout; if not employed, it still remains the
law, ready to be applied whenever the preliminary condi-
tion is performed."   *C. W. & Z. R. R. Co.* v. *Clinton Co.*
1 Ohio St. 88.

The appellants contend that, because this determining
power as to when the charter shall take effect and be-
come operative is, by the terms of the act creating it, left
to the voice of a majority of the resident tax-paying
householders within the limits of the city, and not to the
voice of a majority of the legal voters thereof, therefore
that the act of incorporation is void.

This proposition does not involve the vital question
here.   It was not necessary to the validity of the act of
incorporation to submit it to the whole or to any portion
of the people of the city of Butte for their acceptance or
rejection; the provision of the charter requiring its sub-
mission to the resident tax-paying householders was
conferring the right of suffrage where, before, it did not
exist.   Instead of being an infringement of and a con-
traction of the right of the elective franchise, it was an
expansion thereof.   It was the granting of a privilege
where, before, it did not exist.   It was a mere act of
grace upon the part of the legislature to submit the char-
ter to the people at all, or to any part or portion of them.
They could not have complained, or would have had no
grounds of complaint, if a municipal government had
been established for their city without their consent or
the consent of any of them.   In that event they would
have been deprived of none of their legal rights.   How
much less have they cause to complain when their privi-
leges have been enlarged and they have been granted

rights that they did not before possess. And so the question as to whether the people of the city of Butte have been deprived of their right to vote, which, as appellants eloquently contend, "is one of the highest attributes of a citizen,",does not arise in this case. They could not well be deprived of what they never possessed. They did not have and never had the right to vote upon the adoption of the charter. The legislature conferred the right to vote thereon upon the resident tax-paying householders, and confided to them and their discretion when the law should go into effect. This was the future contingency upon which the operation of the law depended. That the legislature had authority to make the operation of the law to depend upon such a contingency, no one can doubt. The legislature might have confided to one man, a court or judge, to a board or to a commission, to determine when the event had transpired that should set in operation the law.

In the case of *The State* v. *Parker*, 26 Vt. 357, the court says: "If the operation of the law may fairly be made to depend upon a future contingency, then, in my apprehension, it makes no essential difference what is the nature of the contingency, so it be an equal and fair one, a moral and a legal one, and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one."

Submitting the charter to the resident tax-paying householders of the city was equal and fair; it was not illegal or immoral; nor was it idle or arbitrary or opposed to sound policy. This limitation of the right to vote upon the charter, and for officers created by it, was intended to place the government of the city in the hands of those who had to bear its burdens and provide funds for paying its necessary expenses. The resident tax-paying householders of any town or city always represent a vast majority of the property of such town or city. They must provide the funds for carrying on the

municipal government.  It may be "one of the highest attributes of non-paying citizens " to vote a tax upon those who are the owners of property, and to take possession of the fund thereby created and disburse it; but where the right so to do did not exist under the constitution and laws, and where the legislature, in framing the charter, might have legally deprived all citizens of the municipality of the right to vote upon the adoption of the charter and in the election of officers under it, we do not see that the non-tax-paying, or any other citizens, have any cause to complain that they have been deprived of any of their rights.

Where the right to vote did not previously exist under the constitution and the laws, the legislature, in conferring a privilege upon a locality, has the right to limit the right of voting, or to prescribe any other legal restrictions, as a condition precedent to the privilege.  The right to vote upon the adoption of a charter, or at a municipal election, is not an inherent right that belongs to a citizen because he is a citizen.  Municipal corporations are creatures of the legislature.  Its authority is omnipotent, absolute, within the limits of the constitution and the laws.  Within such boundaries it may create a municipal government, define its powers, designate its officers, limit and control their jurisdiction, authority, term of office, duties and forms of proceeding, and when, how and by whom they shall be elected; or it may impose a charter upon the people and appoint the municipal officers, depriving all the people of the right to vote for such officers.  When the people elect their representatives to the legislature they exercise their right of self-government; and they must submit to the laws enacted by their representatives, until such laws, by the proper authority, are declared unconstitutional.

Neither the constitution, the organic act, or the laws, confer upon the people living under a municipal government the right to vote, either upon the question of the

adoption of such government or for the election of officers to carry on the same.

The act, therefore, incorporating the city of Butte is not void for the reason that it limits the right to vote upon the adoption of such act and for officers to the resident tax-paying householders of such city. The judgment is affirmed, with costs.

*Judgment affirmed.*